# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ZOHAR III Limited, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **C.A. No. 2021-0384-JRS** |
| | ) | |
| STILA STYLES, LLC and | ) | |
| LYNN TILTON, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: February 18, 2022
Date Decided: May 31, 2022

C. Barr Flinn, Esquire, Emily V. Burton, Esquire, Lauren Dunkle Fortunato, Esquire, Alberto E. Chávez, Esquire and Kevin P. Rickert, Esquire of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, Attorneys for Plaintiff Zohar III Limited.

Patricia R. Urban, Esquire, Elizabeth Wilburn Joyce, Esquire and Megan Ix Brison, Esquire of Pinckney, Weidinger, Urban & Joyce LLC, Wilmington, Delaware, Attorneys for Defendant Stila Styles, LLC.

Kathleen M. Miller, Esquire and Robert K. Beste, III, Esquire of Smith, Katzenstein & Jenkins LLP, Wilmington, Delaware and Monica K. Loseman, Esquire of Gibson, Dunn & Crutcher LLP, Denver, Colorado, Attorneys for Defendant Lynn Tilton.

**SLIGHTS, Vice Chancellor**

The parties to this dispute have been locked in litigation in various courts, including this one, for nearly a decade regarding control over portfolio companies of Plaintiff, Zohar III Limited ("Zohar"), a collateralized loan obligation ("CLO") vehicle formed years ago by Defendant, Lynn Tilton. This chapter of the saga involves disputed claims of control over one of those portfolio companies, a Delaware limited liability company called Stila Styles, LLC ("Stila" or the "Company"). The parties have lobbed allegations of bad faith and breach of fiduciary duty back and forth towards one another throughout their litigation history and have repackaged those allegations for use in this case. At bottom, however, the relationship between these parties is contractual, and their disputes, therefore, historically have been resolved as a matter of contract. This case is no different. Stila, like all Delaware LLCs, is a "creature[] of contract."[1] That contract, Stila's LLC Agreement as amended (and later defined), clearly sets forth the parties' rights and obligations with respect to the governance and control of Stila.

Tilton caused the formation of Zohar in 2007. She also owns 100% of Zohar's "Preference Shares" and, until 2018, was Zohar's sole director. Through another

---

[1] *Godden v. Franco*, 2018 WL 3998431, at *7 (Del. Ch. Aug. 21, 2018) (citing *TravelCenters of Am., LLC v. Brog*, 2008 WL 1746987, at *1 (Del. Ch. Apr. 3, 2008); *Henson v. Sousa*, 2015 WL 4640415, at *1 (Del. Ch. Aug. 4, 2015); *Touch of It. Salumeria & Pasticceria, LLC v. Bascio*, 2014 WL 108895, at *4 (Del. Ch. Jan. 13, 2014); *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 880 (Del. Ch. 2009); *Fisk Ventures LLC v. Segal*, 2008 WL 1961156, at *8 (Del. Ch. May 7, 2008)).

affiliate, Tilton served as Zohar's "Collateral Manager" until she resigned from that role in 2016.

Through affiliated entities, Tilton was the initial "Class A Member" of Stila upon its formation and remains so today. At various times, Tilton also served as Stila's Manager. According to Tilton, in 2017, she orchestrated a transaction that caused her to be appointed as Stila's sole Manager answerable only to a new class of units she created (the "2017 Transaction"). That transaction is the subject of the dispute *sub judice*.

As central features of the 2017 Transaction, Tilton purported to: (1) create a new class of Stila units; (2) grant the newly created units the sole right to remove and replace an existing Manager or appoint additional Managers (among other rights); (3) issue the newly created units to an entity she controlled; and (4) admit that entity as a new Member of Stila. Tilton purported to take these steps in her capacity as Manager of Stila without seeking or obtaining Zohar's consent as Stila's sole Common Member. That was a mistake. The 2017 Transaction effectively amended Stila's LLC Agreement, which expressly provides that "[e]xcept for any amendments otherwise contemplated herein and except as otherwise provided by law, this Agreement and the Certificate [of Formation] may be amended or modified from time to time only by the Members." Prior to the 2017 Transaction, the LLC Agreement explicitly granted either the Common Members or the Series A Preferred

2

Members the right to remove and replace Stila's Manager. Unlike other provisions of the LLC Agreement that could be amended at the sole discretion of Stila's Manager, the contractual right to remove and replace the Manager could not be amended without the Members' consent. Tilton did not obtain that consent. Consequently, the 2017 Transaction is invalid as a matter of contract, at least as relates to the removal and replacement of Stila's Manager.

## I. BACKGROUND

The following facts were either stipulated to by the parties or proven by a preponderance of the credible, competent evidence presented during trial.[2]

### A. The Parties and Relevant Non-Parties

Plaintiff, Zohar, is an exempted company organized under the laws of the Cayman Islands.[3] It is currently a debtor in bankruptcy along with its sister funds, Zohar CDO 2003-1, Limited and Zohar CDO 2003-1, Corp. (together, "Zohar I"), and Zohar II 2005-1, Limited and Zohar II 2005-1, Corp. (together, "Zohar II") (collectively with Zohar, the "Zohar Funds").[4] The Zohar Funds are all CLO

---

[2] I cite to the joint trial exhibits as "JX __"; the docket items as "D.I. __"; the trial transcript as "Tr. __ (witness name)"; the Pre-Trial Stipulation and Order (D.I. 126) as "PTO [paragraph number]"; and depositions lodged as evidence as "(Name) Dep. __."

[3] PTO ¶ 15.

[4] *Id.*

3

vehicles that hold debt and equity interests in a number of operating portfolio companies.[5]

Defendant, Lynn Tilton, is a Florida resident and the founder of Zohar.[6] She was also Zohar's sole director from January 2017 until May 2018 and, through Octaluna (defined below), has owned 100% of Zohar's preference shares since its formation.[7]

Defendant, Stila, is a Delaware limited liability company and one of Zohar's portfolio companies.[8] It develops, produces, markets and distributes cosmetics under the Stila brand.[9] When Stila was formed, it acquired, through Tilton, substantially all of the assets of non-parties Stila Corp., Stila International, Inc. (and its affiliates), Stila UK Limited and Stila Holding Corp. (the "Stila Assets") from banks that had foreclosed on pledged collateral.[10] Tilton indisputably was Stila's Manager from its formation until November 2017.[11]

---

[5] PTO ¶¶ 15–16.

[6] PTO ¶¶ 18, 21.

[7] PTO ¶¶ 22–23.

[8] PTO ¶ 17.

[9] *Id.*

[10] PTO ¶ 29.

[11] PTO ¶¶ 31, 51.

Non-party, Octaluna III, LLC ("Octaluna"), is a Tilton affiliate that owned 100% of Zohar's preference shares and was the initial "Class A Member" of Stila.[12] Non-party, Ark II CLO 2001-1, Ltd. ("Ark"), is also a Tilton affiliate and the current "Class A Member" of Stila following a transfer of those interests from Octaluna.[13]

## B. The Formation of Zohar

Tilton formed Zohar on April 6, 2007.[14] On the same day, another Tilton affiliate, Patriarch Partners XV, LLC ("Patriarch XV"), was appointed as Zohar's Collateral Manager.[15] Patriarch XV remained Zohar's Collateral Manager until it resigned from that role on March 3, 2016. Alvarez & Marsal Zohar Management, LLC ("AMZM") was appointed as Zohar's new Collateral Manager upon Patriarch XV's resignation.[16]

---

[12] PTO ¶ 19.

[13] PTO ¶ 20; JX 158 (Transfer Agreement dated September 27, 2019, by and between Octaluna and Ark, transferring 100% of the Class A membership interests in Stila from Octaluna to Ark).

[14] PTO ¶ 21.

[15] PTO ¶¶ 26–27.

[16] PTO ¶ 28.

## C. The Formation of Stila and the LLC Agreement

The 2008 financial crisis created significant challenges for Stila Corp.[17] Those challenges led Stila Corp.'s principal lender, Wachovia Bank, to foreclose on the Stila Corp. assets that had been pledged to secure the debt.[18] Upon initiating foreclosure, Wachovia informed Tilton of its immediate plans to liquidate the collateral and asked Tilton if she was interested in acquiring those assets.[19] In response, Tilton submitted a letter of intent to acquire Stila Corp.'s assets from Wachovia (and other lenders),[20] and designated Zohar as the affiliate through which she would consummate the transaction. On April 17, 2009, Tilton executed the Limited Liability Company Agreement of Stila Styles, LLC (as properly amended, the "LLC Agreement") as Stila's Manager on the one hand and as manager of Patriarch XV on behalf of Zohar as Stila's "Common Member" and "Series A Preferred Member" on the other hand.[21]

---

[17] Tr. 290:8–22 (Mercado) (testifying that the "2008 Great Recession" "significantly impacted" the portfolio companies, specifically "the[ir] operations" and "their ability to generate revenue, and subsequently, or consequently, their ability to generate cash").

[18] Tilton Dep. 28:16–29:1; JX 7 (foreclosure agreement between Stila Styles, LLC, Stila Corp., its related entities and its lenders) at 1.

[19] Tilton Dep. 28:16–29:1; JX 7.

[20] PTO ¶ 29.

[21] PTO ¶ 31; JX 5 (Limited Liability Agreement of Stila Styles, LLC) ("Initial LLC Agreement").

The LLC Agreement created two classes of equity interests in Stila: "Common Interests" and "Series A Preferred Interests." Zohar has always been and remains the only holder of Stila's Common Interests.[22] Zohar also held all of Stila's Series A Preferred Interests from the creation of those interests until they were redeemed in February 2016.[23]

Following the execution of the LLC Agreement, on April 22, 2009, Zohar and Stila entered into a credit agreement under which Zohar issued Stila a $7 million senior secured term loan note and a $5 million revolving credit note.[24] Stila then used the proceeds of these loans to acquire the Stila Assets.[25]

In May 2011, the LLC Agreement was amended via Amendment No. 1 to the LLC Agreement[26] and Amendment No. 2 to the LLC Agreement.[27] The parties do not dispute the validity of either amendment.[28] More than four years later,

---

[22] PTO ¶ 33.

[23] *Id.*

[24] PTO ¶¶ 34–35.

[25] PTO ¶ 37.

[26] JX 16 ("Amendment No. 1").

[27] JX 17.

[28] PTO ¶ 38.

7

in September 2015, Tilton executed Amendment No. 3 to the LLC Agreement.[29]

Although Zohar disputes the validity of that amendment the parties have elected not to litigate that dispute in this action.[30]  Accordingly, consistent with the approach taken by the parties, I have not considered Amendment No. 3 in my analysis.

## D. The Bankruptcy Proceedings

On March 11, 2018, Zohar filed for bankruptcy protection in the United States Bankruptcy Court for the District of Delaware.[31]  Near the outset of the bankruptcy, Tilton, Zohar and certain Zohar creditors entered into a settlement agreement, including a standstill that halted litigation and paused efforts to terminate Tilton's control (the "Standstill Agreement").[32]  The Standstill Agreement provided that "no action shall be taken to remove Tilton" from her position "as director, manager,

---

[29] PTO ¶¶ 41, 50.

[30] *See* PTO ¶ 50 ("On November 14, 2017, Zohar filed a declaratory judgment action in this Court (i) disputing the efficacy of the [Amendment No. 3] and the parallel acts taken at ten other Portfolio Companies, and (ii) seeking to confirm its right to remove Tilton as Manager of Stila and as manager or director of each of the 10 other Portfolio Companies (the '11 Companies Action'). *Zohar CDO 2003-1, Ltd. v. Croscill Home LLC*, C.A. No. 2017-0816-JRS (Del. Ch.).  Tilton removed the 11 Companies Action to the District Court and the Zohar Funds disputed the removal. *Zohar CDO 2003-1, Ltd., et al. v. Croscill Home LLC, et al.*, No 1:17-cv-01797-JFB-SRF (D. Del.)."); PTO ¶ 52 ("The Magistrate Judge adjudicating the 11 Companies Action recommended that the 11 Companies Action be remanded. No. 17-1797-JFB-SRF.  The Magistrate Judge's recommendation continues to await consideration by the District Court, as the action was stayed due to the automatic stay resulting from the Zohar Funds filing for bankruptcy.").

[31] PTO ¶ 72.

[32] PTO ¶ 74.

8

and officer."[33]  On May 21, 2018, the Bankruptcy Court entered an order approving the settlement agreement, including the Standstill Agreement.[34]

As part of the bankruptcy proceedings, in September 2018, Tilton's counsel provided Zohar's bankruptcy counsel with approximately 100 documents, among which were the organizational documents of various portfolio companies, including Stila.[35]  Through this production, Zohar received two of three documents that collectively compromise the 2017 Transaction—the Joinder Agreement and the Subscription Agreement were produced but the 2017 Written Consent approving the 2017 Transaction was not.[36]  These three documents are defined and discussed in more detail below.

On March 9, 2020, the Zohar Funds commenced a plenary action against Tilton in the Bankruptcy Court (the "Adversary Proceeding") by filing their Initial Adversary Complaint.[37]  Tilton and her co-defendants filed a motion to dismiss that pleading on September 21, 2020.[38]  After additional motion practice, on June 18,

---

[33] JX 132 at 9.

[34] PTO ¶ 76.

[35] PTO ¶ 78.

[36] *Id.*

[37] PTO ¶ 79;  *Zohar III, Corp. v. Patriarch P'rs, LLC*, No. 18-10512 (KBO) (Bankr. D. Del.).

[38] PTO ¶ 80.

2021, the Bankruptcy Court granted in part and denied in part the motion to dismiss.[39] Zohar and the other debtors filed an Amended Adversary Complaint on September 1, 2021.[40] Stila is among the Zohar Funds' portfolio companies referenced in Counts I, XXIV, XXV, and XXIX of the Amended Adversary Complaint.[41] On October 15, 2021, Tilton and the other defendants filed a motion to dismiss the Amended Adversary Complaint.[42] That motion is pending.

## E. The 2017 Transaction

In 2017, Stila was in growth mode—growing at about twenty percent year-over-year.[43] This expansion, and the demands Stila faced as a "prestige beauty

---

[39] PTO ¶ 86.

[40] *Id.*

[41] In Count I of the Amended Adversary Complaint, the Zohar Funds seek a declaratory judgment regarding equity ownership of the portfolio companies. JX 272 (First Amended Complaint in the Adversary Action) ("Am. Adversary Compl.") ¶¶ 260–72. Count XXIV is brought by the Zohar Funds against Tilton (and the "Octaluna Entities" as defined in the Amended Adversary Complaint) for unjust enrichment related to certain tax dividends paid to Tilton. Am. Adversary Compl. ¶¶ 458–63. Count XXV is a claim for breach of the "LLC Agreements" against Tilton brought by Zohar II 2005-1, Corp. individually, and the Zohar Funds collectively, on behalf of the portfolio companies. Am. Adversary Compl. ¶¶ 464–522. In Count XXIX, Zohar II, individually, and the Zohar Funds collectively on behalf of the portfolio companies, bring a breach of fiduciary duty claim against Tilton in connection with the 2017 Transaction (and similar transactions that Tilton authorized at other portfolio companies). Am. Adversary Compl. ¶¶ 575–96.

[42] PTO ¶ 86.

[43] Tr. 444:16–20 (Tilton) ("So [Stila] was growing rapidly. Every year it was growing, but that was probably our biggest growth spurt between '16 and '18.").

company,"[44] generated a "huge working capital" need.[45]  Stila's need for cash was exacerbated by the mounting (and looming) tax distributions it owed Tilton.[46]  During the fourth quarter of 2017, based on the financials available to her at the time, Tilton believed that Stila did not have enough cash "to pay tax distributions and have

---

[44] Tr. 412:6–414:12 (Tilton) (explaining that Stila was a "prestige" color cosmetic company and not a "mass company [] who sells to Walmart or drugstores").  Tilton explained this meant that "four times a year you have to invent new product that you ship to these customers.  And at the same time, you have to update what we call a gondola, which is what carries your makeup in -- you know, we sell to Sephora, we sell to Ulta, to Macy's, to Nordstrom's . . . .  But we had to pay for that -- we call it AP&P, our advertising and promotion.  We have to pay for those gondolas.  But four times a year we have to ship new product and update those gondolas.  So it's a constant struggle to innovate.  And if you don't come up with first-to-market type of things, you don't really sell it."  *Id.*  This constant cycle "puts a great burden on the company and other companies in the same class."  *Id.*

[45] Tr. 476:6–16 (Tilton).

[46] Because Stila is a disregarded entity, under Section 4.9 of the LLC Agreement, Stila is obligated to make tax distributions to each Member, or if the Member is a disregarded entity for United States Federal income tax purposes, then Stila is obligated to make the tax distribution "directly to the owner of such Member that is considered the Member for United States Federal income tax purposes."  Initial  LLC Agreement § 4.9.  This meant that, for as long as Stila remained a disregarded entity, the tax distributions in Section 4.9 were owed to Tilton as Zohar's tax partner for each year Stila had taxable income.  Tr. 396:14–397:9 (Tilton); Initial  LLC Agreement § 4.9.  The tax distributions accumulated over several years, as Tilton deferred the tax distributions to allow Stila to use its limited cash to grow its business.  *See* Tr. 427:4–429:9 (Tilton) (detailing each year's deferred amount); JX 14 at 31; JX 18 at 31; JX 20 at 32; JX 22 at 32; JX 26 at 35; JX 31 at 36.  Through 2015, the deferred tax obligation to Tilton had accumulated to $21,797,437.  *See* Tr. 429:8–9 (Tilton) ("The cumulative owed [by 2016] was about $21.8 million."); Tr. 431:2–7 (Tilton) ("In all those years, I agreed to defer because I was able to reduce my personal taxable income through losses in other places.  And so I didn't demand those payments, and deferred to allow the company to use that 22 million of working capital to grow the business.").

11

sufficient working capital to run the business."[47]  According to Tilton, this need for cash was the "sole purpose" for the 2017 Transaction, as it would provide the liquidity that Stila needed to continue to operate while also being able to discharge its obligation to pay the deferred tax distributions.[48]  Zohar disagrees and argues that "Tilton effected the 2017 Transaction [on patently unfair terms] to serve her personal desire for perpetual control over Stila[.]"[49]

On November 13, 2017, Tilton caused three documents to be executed that collectively memorialize the 2017 Transaction: (1) a written consent of Stila's Manager that, in several steps laid out in the document and discussed immediately below, authorized and approved the sale and issuance of a new class of Stila membership interests to Octaluna and the appointment of Tilton as Stila's sole Manager answerable only to the newly created unitholder(s) (the "2017 Written Consent"),[50] (2) a subscription agreement selling the new "Class A Interests" to

---

[47] Tr. 518:12–17 (Tilton) ("Q.  So you testified at your deposition that the sole purpose of the 2017 transaction was permitting Stila to pay tax distributions to Octaluna; correct? A. Well, to pay tax distributions and have sufficient working capital to run the business.").

[48] *Id.*  As Tilton explained, "the November 2017 Written Consent authoriz[ed] the issuance of the Class A [shares] to Octaluna, for an investment of $10 million."  Lynn Tilton's Post-Trial Opening Br. ("Tilton Post-Trial Opening Br.") (D.I. 152) at 18; *see also* Initial LLC Agreement §§ 3.4, 3.6, 5.4; JX 92; JX 93.

[49] Pl. Zohar III Ltd.'s Opening Post-Trial Br. ("Zohar Post-Trial Opening Br.") (D.I. 153) at 2.

[50] JX 93 (email attaching a copy of the Stila Styles, LLC Action by Written Consent of the Manager, executed by Tilton in her capacity as Stila's Manager) ("2017 Written Consent").

12

Octaluna (the "Subscription Agreement"),[51] and (3) a joinder agreement to the LLC Agreement that Octaluna was required to sign in order to become a new member of Stila (the "Joinder Agreement").[52]

In its Complaint, Zohar seeks a declaration that the 2017 Written Consent was invalid,[53] which would have the effect of undoing the entire 2017 Transaction. While the Subscription Agreement and Joinder Agreement were required to consummate the 2017 Transaction, the authority to enter into these agreements flowed from the authority given to the Manager in the 2017 Written Consent.

The 2017 Written Consent sequenced Tilton's seizure of control over Stila by: (1) creating the Class A Interests, (2) granting the Class A Interests certain rights described below, (3) providing that Stila will pay 5x the investment amount to the holder of the Class A Interests when Stila is sold or liquidated, (4) approving the sale

---

[51] JX 94 (copy of the Subscription Agreement, by and between Octaluna and Stila, executed by Robert Leonardo in his capacity as CFO of Stila and Tilton in her capacity as Manager of Octaluna).

[52] JX 96 (copy of the Joinder to Amended and Restated Limited Liability Company Agreement, by and between Octaluna and Stila, executed by Leonardo in his capacity as CFO of Stila and Tilton in her capacity as Manager of Octaluna); *see also* PTO ¶ 67. After the Class A Interests were transferred to Ark from Octaluna, Ark also executed a joinder agreement. *See* JX 157.

[53] Verified Compl. ("Compl.") (D.I. 1) at ¶ 92. I note, however, that Zohar's sole request in its prayer for relief is for "the Court [to] enter judgment declaring that under 6 *Del. C.* Section 18-110 Kevin Carey is the Manager of Stila and granting such other relief as this Court deems just and appropriate." Compl. at 21.

of 100% of the Class A Interests to Octaluna in exchange for $10,000,000, subject to the terms of the Subscription Agreement, (5) admitting Octaluna as a Class A Member of Stila, and (6) authorizing the proceeds from the 2017 Transaction to be used for "working capital and other uses as determined and approved by the Manager in her sole discretion[.]"[54] To effectuate these various steps, the 2017 Consent also provided that, "effective upon the issuance of the Class A Interests, Exhibit A of the LLC Agreement shall be amended" as needed to cause the events Tilton orchestrated to be authorized by Stila's constitutive document.[55]

As contemplated by the 2017 Written Consent and Subscription Agreement, Octaluna paid $10 million to Stila and, in exchange, purportedly received certain rights with respect to Stila that are especially relevant here[56]:

> [N]otwithstanding anything to the contrary contained in the LLC Agreement, the Class A Interests shall have the *sole right* to:
>   A. Remove or replace an existing Manager or appoint any additional manager; provided that, any Manager may resign at any time, effective immediately upon notice to any Class A Member;
>   B. Direct the Manager on all matters in which the approval of the Members is required by the Certificate (as defined in the LLC

---

[54] 2017 Written Consent at 4.

[55] *Id.* at 3. In the recitals, the 2017 Written Consent states, "Section 3.4 of the LLC Agreement provides that, upon the creation and issuance of other classes of Membership Interests, the terms of such Membership Interests shall be reflected in a written consent of the Manager, which shall be deemed to be contained in the LLC Agreement for all purposes thereof." *Id.*

[56] PTO ¶¶ 67–68; 2017 Written Consent at 4. The $10 million was deposited into a Stila bank account for which Tilton was sole signatory. PTO ¶¶ 68–70.

Agreement), the LLC Agreement, or nonwaivable provisions of applicable law;

C. Amend the LLC Agreement; or

D. Dissolve or wind-up the affairs of the Company (it being understood that any dissolution or wind-up of the Company that would not otherwise require the consent of any Member shall not require such consent solely by virtue of this clause)[.][57]

Zohar was not consulted regarding the 2017 Transaction and was never asked to give its consent to the transaction or any related amendments to the LLC Agreement.[58]

## F. Changes in Stila's Manager Post-2017 Transaction

Tilton resigned as Manager of Stila on March 21, 2020, by tendering her resignation letter to Zohar's sole Director and Chief Restructuring Officer.[59] Five days later, on March 26, Tilton purported to rescind her resignation.[60] On April 21, 2020, Tilton, signing on behalf of Ark, executed a written consent as the Class A Member of Stila (as per the authority purportedly vested in her through the 2017 Transaction), providing that Ark was appointing Tilton as Manager of Stila

---

[57] 2017 Written Consent at 4.

[58] *See* PTO ¶ 67 (stipulating to the fact that the 2017 Written Consent was executed by Tilton in her capacity as Stila's Manager); Tilton Dep. 340:15–21 ("Q. When did you inform Zohar III that the Class A interests had been issued? A. I know that it was provided at the time of bankruptcy. I don't know if it was provided for any reason prior to that time. So certainly by March 2018 it was the -- in the hands of Zohar's lawyers.").

[59] PTO ¶ 99.

[60] PTO ¶ 100.

(the "2020 Written Consent").[61] A year later, on April 30, 2021, Zohar executed a written consent as Stila's Common Member purporting to appoint Kevin Carey, Esquire as Manager of Stila (the "2021 Written Consent"),[62] and notified Tilton and AMZM of the appointment later that day.[63]

### G. Procedural Posture

On May 1, 2021, Zohar filed its Complaint against Tilton and Stila in this Court requesting a judgment declaring under Section 18-110 of Delaware's LLC Act that Kevin Carey is the rightful Manager of Stila.[64] The case was subsequently removed to the United States District Court for the District of Delaware and then referred to the Bankruptcy Court for the District of Delaware at Tilton's request.[65] The Bankruptcy Court then remanded the case back to this Court under 28 U.S.C. §§ 1334 and 1452(b).[66]

---

[61] PTO ¶ 101; Tr. 405:23–406:3 (Tilton) (testifying that she did not seek anyone's approval when she appointed herself as Manager because she "had sole authority to make that appointment").

[62] PTO ¶ 105; JX 241 (email to Lynn Tilton attaching the Written Consent of the Sole Common Member and the Sole Series A Preferred Member of Stila Styles, LLC).

[63] PTO ¶ 106.

[64] Compl. at 21; PTO ¶¶ 1–2.

[65] PTO ¶ 3.

[66] PTO ¶ 5.

The Court held a two-day trial beginning on December 1, 2021,[67] and heard post-trial argument on February 18, 2022.[68] This is the Court's post-trial decision.

Zohar makes three arguments in support of its requested declaration. First, Zohar argues Tilton did not have the authority under the LLC Agreement to effectuate the 2017 Transaction because she purported to amend certain provisions of the LLC Agreement without obtaining Zohar's consent.[69] Second, Zohar argues that even if Tilton did have the authority to effectuate the 2017 Transaction, her actions amount to a breach of the covenant of good faith and fair dealing because she acted for the sole purpose of entrenchment to the detriment of Zohar as Stila's sole Member.[70] Finally, Zohar argues that the 2017 Transaction was not entirely fair because it was not on market terms as required under the LLC Agreement.[71]

For her part, Tilton argues at the threshold that Zohar has no right to bring this action against her because the claim is barred by laches or acquiescence and, in any event, the LLC Agreement absolves her from any and all liability.[72] On the merits,

---

[67] D.I. 144–45 (Trial Transcripts).

[68] D.I. 172 (Post-Trial Oral Argument Transcript).

[69] Zohar Post-Trial Opening Br. at 7–12.

[70] *Id.* at 21–54.

[71] *Id.* at 56–72.

[72] Tilton Post-Trial Opening Br. at 45–49, 79–86.

17

she maintains that, under the LLC Agreement, she was authorized to effectuate the 2017 Transaction as Manager and was not obliged to seek and obtain Zohar's consent.[73] She also argues that the evidence reveals the 2017 Transaction was not the product of bad faith.[74] With respect to Zohar's entire fairness argument, Tilton argues the 2017 Transaction did not have to be entirely fair and, even if it did, the terms of the agreements effectuating the transaction satisfied that standard.[75]

As noted, Zohar initiated this action as a summary proceeding under 6 *Del. C.* § 18-110(a).[76] Consistent with this court's preference, the parties brought their summary dispute directly to trial without testing the allegations of the complaint or sufficiency of the evidence through pleading stage or summary judgment motion practice.[77] Consequently, the potentially dispositive contractual aspects of the

---

[73] *Id.* at 70–73.

[74] *Id.* at 51–65.

[75] *Id.* at 75–79.

[76] *See* 6 *Del. C.* § 18-110(a) ("Upon application of any member or manager, the Court of Chancery may hear and determine the validity of any admission, election, appointment, removal or resignation of a manager of a limited liability company. . . ."); *Llamas v. Titus*, 2019 WL 2505374, at *15 (Del. Ch. June 18, 2019) ("A proceeding under Section 18-110(a) 'is summary in character, and its scope is limited to determining those issues that pertain to the validity of actions to elect or remove' a manager.") (citing *Genger v. TR Invs.*, 26 A.3d 180, 199 (Del. 2011)), *judgment entered*, 2019 WL 2869771 (Del. Ch. July 2, 2019).

[77] *See La. Mun. Police Emps. Ret. Sys. v. Morgan Stanley & Co., Inc.*, 2011 WL 773316, at *3 (Del. Ch. Mar. 4, 2011) ("The summary nature of the proceeding 'dictate[s] against allowing preliminary motions addressed to the pleadings to be presented and decided. . . . Such a practice would tend to promote delay, thereby undercutting the statutory mandate

parties' dispute were first presented at trial, along with the typical refrains of bad faith and breach of fiduciary duty that have reverberated throughout the parties' litigation history. After having heard all aspects of this dispute during and following trial, as explained below, I am convinced the outcome is dictated by the clear and unambiguous terms of Stila's LLC Agreement, a contract that governs the rights and obligations of Zohar on the one hand, and Tilton and her affiliates on the other. Accordingly, there is no need to address or decide the allegations of bad faith and breach of fiduciary duty.[78]

## II. ANALYSIS

"This Court has the authority under 6 *Del. C.* § 18-110(a) to 'hear and determine . . . the right of any person to become or continue to be a manager of a limited liability company.'"[79] "In determining what claims are cognizable in a

---

and policy that the proceeding be summary in character.'") (quoting *Coit v. Am. Century Corp.*, 1987 WL 8458, at *1 (Del. Ch. Mar. 20, 1987)); *see also Coit*, 1987 WL 8458, at *1 ("[M]otions of this kind ought not to be presented for decision in advance of the final hearing on the merits except where necessary to avoid substantial prejudice.").

[78] I note that these allegations are featured in related (and significantly broader) litigation between these parties pending in the United States Bankruptcy Court for the District of Delaware. Deciding them here when that is unnecessary is inefficient and could implicate notions of comity and claim preclusion. *See Bayard v. Martin*, 101 A.2d 329, 333 (Del. 1953) ("[I]t has been regarded as a rule of universal jurisprudence, based upon principles of comity, that courts must avoid conflicts with each other."); *see also* Am. Adversary Compl. ¶¶ 192–96, 395–413, 420–24, 455–522, 575–96, 639–46.

[79] *MPT of Hoboken TRS, LLC v. HUMC Holdco, LLC*, 2014 WL 3611674, at *8 (Del. Ch. July 22, 2014) (quoting 6 *Del. C.* § 18-110).

[Section 18-110] action, the most important question that must be answered is whether the claims, if meritorious, would help the court decide the proper composition of the [company's] board or management team."[80]

"In governance disputes among constituencies in an LLC, the starting (and end) point almost always is the parties' bargained-for operating agreement, and the court's role in these disputes is to 'interpret [the] contract [and] effectuate the parties' intent.'"[81] This is because "LLC agreements are creatures of contract, which should be construed like other contracts."[82] When doing the work of contract construction, "Delaware [courts] adhere to the 'objective' theory of contracts, i.e., a contract's construction should be that which would be understood by an objective, reasonable third party."[83] In this regard, "[w]hen this Court has found the language

---

[80] *Agranoff v. Miller*, 1999 WL 219650, at *17 (Del. Ch. July 28, 1999), *aff'd*, 727 A.2d 530, 1999 WL 636634 (Del. 1999) (TABLE); *Genger*, 26 A.3d at 199 (quoting *Agranoff*).

[81] *A & J Cap., Inc. v. L. Office of Krug*, 2018 WL 3471562, at *5 (Del. Ch. July 18, 2018) (alterations in original) (quoting *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2012 WL 2356489, at *7 (Del. Ch. June 21, 2012)).

[82] *Mickman v. Am. Int'l Processing, LLC*, 2009 WL 2244608, at *2 (Del. Ch. July 28, 2009) (citing *Arbor Place, LP v. Encore Opportunity Fund, LLC*, 2002 WL 205681, at *3 (Del. Ch. Jan. 29, 2002)).

[83] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (quoting *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)).

of a contract clear and unambiguous, it has refused to expand the contract's scope to include rights not expressly granted."[84]

As noted, Zohar seeks an order declaring that Tilton's attempt to install herself as Manager of Stila was ineffective because the 2017 Transaction upon which the 2020 Written Consent rests was invalid. On this point, Zohar's breakfront argument is that "[t]he 2017 Transaction purported to amend the LLC Agreement in a manner not permitted without the Member's approval."[85] For the reasons explained below, I agree.

I begin by addressing Tilton's threshold arguments that (1) laches, (2) acquiescence and (3) Section 5.17(b) of the LLC Agreement each bar Zohar's claim. After finding these arguments unpersuasive, I turn to the dispositive issue and conclude that portions of the 2017 Transaction and the entire 2020 Written Consent are invalid under the clear and unambiguous terms of the LLC Agreement.

## A. Zohar's Claims Are Not Barred by Laches or Acquiescence

Tilton argues that the equitable doctrines of laches and acquiescence bar Zohar's claims "[g]iven Zohar's unreasonable delay" in bringing its claim.[86]

---

[84] *DG BF, LLC v. Ray*, 2020 WL 3867123, at *4 (Del. Ch. July 9, 2020), *appeal refused*, 237 A.3d 70 (Del. 2020).

[85] PTO ¶ 131(a).

[86] Tilton's Post-Trial Opening Br. at 79.

To prevail on the affirmative defense of laches, the defendant must demonstrate "first, knowledge by the claimant; second, unreasonable delay in bringing the claim; and third, prejudice to the defendant."[87]

Laches does not apply here for several reasons. First, Tilton did not prove unreasonable delay. While "[t]his court frequently uses the analogous statutory limitations period as the presumptive limitations period for laches,"[88] which in this case would be three years,[89] I agree with Tilton that the analogy is not as apt here given that this is a summary Section 18-110 action where prompt resolution is often imperative.[90] Even so, in the laches context, "[t]he reasons for the delay are more

[87] *Keyser v. Curtis*, 2012 WL 3115453, at *15 (Del. Ch. July 31, 2012) (quoting *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 210 (Del. 2005)), *aff'd sub nom*, *Poliak v. Keyser*, 65 A.3d 617, 2013 WL 1897638 (Del. 2013) (TABLE); *see also Martin v. Med-Dev Corp.*, 2015 WL 6472597, at *17 (Del. Ch. Oct. 27, 2015) (finding no claim of prejudice where defendant failed to demonstrate a "material change of position in reliance on [the plaintiff's] delay in bringing [the Section 225] action").

[88] *de Adler v. Upper New York Inv. Co. LLC*, 2013 WL 5874645, at *12 (Del. Ch. Oct. 31, 2013); *see also IAC/InterActiveCorp v. O'Brien*, 26 A.3d 174, 177 (Del. 2011) ("Although 'the limitations of actions applicable in a court of law are not controlling in equity,' the Court of Chancery ordinarily will follow the applicable statute of limitations.") (quoting *Reid v. Spazio*, 970 A.2d 176, 183 (Del. 2009)).

[89] *See* 10 *Del. C.* § 8106(a).

[90] Lynn Tilton's Post-Trial Answering Br. (D.I. 161) at 79 ("Zohar also argues that the Court should find that Zohar had three years to bring its claims under the analogous statute of limitations. In the Section 18-110 context (or the corporate analog, Section 225), however, delay of even a month and a half has been held sufficient to bar a claim under the doctrine of laches.") (internal quotation marks omitted); *see Klaassen v. Allegro Dev. Corp.*, 2013 WL 5739680, at *20 (Del. Ch. Oct. 11, 2013) ("In the Section 225 context, a

critical than the amount of time that has elapsed."[91]   Here, Zohar was not provided

with a copy of, nor did it otherwise know of, the 2017 Written Consent until April 9,

2019, so it could not have discovered the material details of its claim until then.[92]

Once those details were known, the Standstill Agreement prevented Zohar from

filing an action until October 2019.[93]   Only five months later, on March 9, 2020,

Zohar filed its Initial Adversary Complaint, where it asserted that the 2017

Transaction was void.  This five-month delay from knowledge of the claim to filing

can hardly be characterized as unreasonable given the many disputes that were

percolating or in litigation between these parties at the same time.  This is especially

so given the complexity of the claims pled in the highly detailed Initial Adversary

Complaint.[94]   Even if measured by the time when Zohar filed its Complaint in this

---

delay of even a month and a half has been sufficient to bar a claim under the doctrine of laches."), *aff'd*, 106 A.3d 1035 (Del. 2014).

[91] *Id.*

[92] 2017 Written Consent at 4; Tr. 331:15–20 (Katzenstein); JX 151; *see also Dubroff v. Wren Hldgs., LLC*, 2009 WL 1478697, at *6 (Del. Ch. May 22, 2009) (rejecting laches argument because defendant's partial disclosure failed to provide enough information to put plaintiffs on inquiry notice).

[93] PTO ¶ 74.

[94] Tr. 337:11–24 (Katzenstein); *see also Stewart v. Wilm. Tr. SP Servs., Inc.*, 112 A.3d 271, 295 (Del. Ch. 2015) (finding no unreasonable delay where it was "reasonable to infer that investigation [for the complaint] took a considerable amount of time because of its factual complexity rather than delay"), *aff'd*, 126 A.3d 1115 (Del. 2015).  I note that Zohar sought to expedite its claims in the Bankruptcy Court but that application was denied.  *See* JX 218; JX 242.

Court, that filing occurred on May 1, 2021, seven months after discovery of the claim.[95] That is not unreasonable delay, particularly given the evidence that "Zohar has been consistently disputing Tilton's control [of Zohar's portfolio companies] since 2016."[96]

Second, the record contains no credible evidence that Tilton was prejudiced by the five-month "delay." To the contrary, Tilton made no "material change of position in reliance on [Zohar's] delay in bringing this action."[97] As explained, Tilton knew that Zohar disputed her right to name Stila's Manager from 2016 onward. None of the facts she proffers as "prejudice" are "a result of [Zohar's] delay in filing the suit."[98]

---

[95] PTO ¶ 2. Tilton argues Zohar "sat on its hands" in filing the Delaware action. Tilton Post-Trial Opening Br. at 82. That Zohar preferred to "wait and see what Judge Owens said about how this case would be run" does not equate to unreasonable delay. Tr. 373:6–9 (Katzenstein); *see Keyser*, 2012 WL 3115453, at \*15 (emphasizing that the court must determine that the delay was unreasonable before dismissing a claim for laches).

[96] Zohar Post-Trial Opening Br. at 82; *see* JX 99 at 22, 24; JX 179 at 1; Tr. 525:18–22 (Tilton); *see also* JX 178 at 3 ("[T]he declaratory relief that the Zohars now seek [in the Adversary Proceeding] would permit the Zohars to replace me as Manager or Board of the Group A and Group B portfolio companies as they have attempted to do since November 2016.").

[97] *Martin*, 2015 WL 6472597, at \*17.

[98] *BlackRock Credit Allocation Income Tr. v. Saba Cap. Master Fund, Ltd.*, 224 A.3d 964, 982 (Del. 2020); *see also Martin*, 2015 WL 6472597, at \*17 (rejecting laches defense in part because defendants failed to demonstrate "a material change of position in reliance on [plaintiff's] delay in bringing [the] action"). Tilton's arguments for prejudice are that she "continued to manage Stila[] without compensation" throughout the period of "delay," and that she provided other financial benefits to Stila, such as deferring tax distributions and providing a $10 million investment. Tilton Post-Trial Opening Br. at 82, 84. But, as Zohar

24

Tilton's acquiescence argument fares no better. Acquiescence can bar a claim as a matter of equity when a plaintiff "has full knowledge of his rights and the material facts and (1) remains inactive for a considerable time; or (2) freely does what amounts to recognition of the complained of act; or (3) acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved."[99] "The doctrine of acquiescence effectively works an estoppel: where a plaintiff has remained silent with knowledge of her rights, and the defendant has knowledge of the plaintiff's silence and relies on that silence to the defendant's detriment, the plaintiff will be estopped from seeking protection of those rights."[100]

---

points out, Stila pays Tilton's affiliate, Patriarch Partners Management Group, LLC, $100,000 a month for advisory services. JX 221 at 11–12. And given her investment in Stila, Tilton was fully incentivized to do what she could to help Stila succeed regardless of what Zohar did (or did not do) to protect its own rights. *See* Zohar Post-Trial Answering Br. ("Zohar Post-Trial Answering Br.") (D.I. 162) at 75 ("[Tilton's] right to any hypothetical return on Zohar's preference shares remains unchanged. The $10 million Proceeds have remained under her control, in a bank account of her choosing at substantially all times."). Moreover, there is no evidence Tilton changed her strategy or work for Stila relying on Zohar's supposed delay. Indeed, as Zohar points out, Tilton herself has taken some steps that caused delay of "an adjudication before this Court," including removal to federal court, filing for bankruptcy, and others. *See id.* at 75–76 (detailing Tilton's actions causing delay).

[99] *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1047 (Del. 2014) (quoting *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 582 (Del. Ch. 1998)).

[100] *Lehman Bros. Hldgs. Inc. v. Spanish Broad. Sys., Inc.*, 2014 WL 718430, at *9 (Del. Ch. Feb. 25, 2014), *aff'd*, 105 A.3d 989 (Del. 2014).

As explained, Zohar did not have "full knowledge of [its] rights and the material facts" regarding Tilton's seizure of managerial control until April 9, 2019, when it received the 2017 Written Consent.[101] Tilton did not execute the ultimate step to take control until she delivered the 2020 Written Consent. Thereafter, Zohar did not "remain inactive for a considerable time" or act as if it recognized Tilton's position. Tilton herself testified that, from her perspective, Zohar has been "litigating to remove [her] as Stila's manager" for "*all of the time* that [she] had been acting as Stila's manager."[102] That is not behavior consistent with acquiescence.[103]

## B. Zohar's Claim Is Not Barred By the LLC Agreement

Tilton's second threshold argument is that Zohar's claim is barred by Section 5.17(b) of the LLC Agreement. That section provides:

> None of the Manager, (ii) any Member, (iii) any director, officer, partner, equity holder, controlling Person or employee of the Manager or any Member . . . (each an "Indemnified Party") will be liable to the company, the Manager, any Member . . . for any act or omission, including any breach of this Agreement or any breach of duty (fiduciary or otherwise) . . . , even if the act or omission furthers such Indemnified Party's own interest, unless such act or omission constitutes a bad faith

---

[101] *Klaassen*, 106 A.3d at 1047.

[102] Tr. 525:18–22 (Tilton) (emphasis added).

[103] *See, e.g.*, *Simple Glob., Inc. v. Banasik*, 2021 WL 2587894, at *13 (Del. Ch. June 24, 2021) (finding counterclaimant acquiesced because "[h]e did not raise any challenge to the stock transfer until asserting his counterclaim in this action," "he freely recognized the act about which he now complains," and "[h]is prior conduct led the Company to believe that he had approved and was in full agreement with the share transfer").

26

violation of such Indemnified Party's implied contractual covenant of good faith and fair dealing . . . .[104]

Tilton asserts this language limits Zohar's ability to bring any claim under the LLC Agreement except claims "for bad faith violations of the implied covenant [of good faith and fair dealing]."[105] I disagree.

It is true that Section 5.17(b) eliminates the Manager's *liability* for "any act or omission, including any breach of [the LLC Agreement] or any breach of duty (fiduciary or otherwise)."[106] This language, however, cannot be read to bar a Section 18-110 claim seeking the court's determination regarding the validity of an action taken by the Manger, even if that determination requires the Court to interpret the LLC Agreement. As this court recognized in *Kahn Bros. & Co. v. Fishbach Corp.*,[107] the test for determining whether a claim can properly be decided under § 18-110 is "whether it is necessary to decide [the claim] in order to determine the validity of the election or designation by which the defendant claims to hold office."[108] In this case, the 2017 Transaction is the "designation" by which Tilton

---

[104] Initial LLC Agreement § 5.17(b).

[105] Lynn Tilton's Pre-Trial Br. ("Tilton Pre-Trial Br.") (D.I. 131) at 7; *see also* Tilton Post-Trial Opening Br. at 41.

[106] Initial LLC Agreement § 5.17(b).

[107] 1988 WL 122517 (Del. Ch. Nov. 15, 1988).

[108] *Id.* at *5 (interpreting 8 *Del. C.* § 225, the corporate analog to 6 *Del. C.* § 18-110); *see also Agranoff*, 1999 WL 219650, at *17 ("In determining what claims are cognizable

claims to be the rightful Manager of Stila. Deciding whether she exceeded her contractually granted authority in effectuating the 2017 Transaction and then executing the 2020 Written Consent, therefore, is necessary to determine whether she is, in fact, the rightful Manager of Stila.

Moreover, Section 18-110 actions are *in rem*, not *in personam*, proceedings, meaning the dispute is over the *res*, i.e., the corporate office, not the personal liability of the LLC's constituents.[109] While Zohar has made allegations of bad faith and breach of contractual fiduciary duties, it has done so as means to invalidate the 2017 Transaction and 2020 Written Consent, not to hold Tilton personally liable for damages or other remedies. Accordingly, Section 5.17(b), by its terms, is not implicated here.

\* \* \* \* \*

Having dispensed with Tilton's threshold defenses, I turn next to the merits of Zohar's Section 18-110 claim.

---

in a § [18-110] action, the most important question that must be answered is whether the claims, if meritorious, would help the court decide the proper [manager of the company] . . . . In a § [18-110] action . . . this court can determine that a person does not hold corporate office because he obtained the office through fraud or breach of contract.").

[109] *See Genger*, 26 A.3d at 199 (interpreting 8 *Del. C.* § 225, the corporate analog of 6 *Del. C.* § 18-110); *see also Arbitrium (Cayman Islands) Handels AG v. Johnston*, 1995 WL 606310, at \*4 (Del. Ch. Oct. 6, 1995) ("[T]he character of a § 225 action is *in rem*."); *Feeley v. NHAOCG, LLC*, 2012 WL 966944, at \*5 (Del. Ch. Mar. 20, 2012) ("Section 18–110 of the LLC Act grants this Court *in rem* jurisdiction to determine who validly holds office as a manager of a Delaware limited liability company.").

## C. The Right Granted to The Class A Interests to Remove and Appoint the Manager Is Invalid.

Tilton argues she had the authority under the LLC Agreement to effectuate the 2017 Transaction in her sole discretion without Zohar's knowledge or consent. Specifically, she argues that Sections 3.4 and 5.4 of the LLC Agreement authorized her to grant Octaluna the Class A Interests on terms that she deemed appropriate, including the sole right to remove, replace, and appoint Stila's Manager, as well as the sole right to amend the LLC Agreement as needed to effectuate the transaction.[110]

Section 3.4 states in relevant part:

> [The] Manager may from time to time in her sole discretion authorize and direct the creation and issuance of other classes of Membership Interests having such terms as she determines to be appropriate, which terms will be reflected in a written consent of the Manager and will be deemed to be contained in this Agreement for all purposes hereof.[111]

---

[110] Tilton Post-Trial Opening Br. at 26–27.

[111] Initial LLC Agreement § 3.4.

Section 5.4 states:

> Except for situations in which the approval of the Member is required by the Certificate, this Agreement or nonwaivable provisions of applicable law . . . the Manager may make all decisions and take all actions for the Company not otherwise provided for in this Agreement, including the . . . creating and issuing [of] other classes of Membership Interests. . . .[112]

While Zohar acknowledges the Manager's rights as stated in Sections 3.4 and 5.4, it maintains that nothing in these provisions allows the Manager to bypass the LLC Agreement's requirements for seeking the Member's consent before amending the LLC Agreement when such consent is required, including as required under Section 11.3.[113] That section provides, "[e]xcept for any amendments otherwise expressly contemplated herein and except as otherwise provided by law, this Agreement and the Certificate may be amended or modified from time to time only by the Members."[114] According to Zohar, Section 11.3 clearly provides that if the Manager is not expressly given the authority to amend a provision of the

---

[112] *Id.* at §§ 5.4, 5.4(a).

[113] Zohar Post-Trial Opening Br. at 7–12.

[114] Initial LLC Agreement § 11.3. The LLC Agreement defines the term "Member" as "any Person executing this Agreement as a member as of the date of this Agreement or hereafter admitted to the Company as a member as provided in this Agreement, solely in such Person's capacity as a member of the Company and not in any other capacity. The term 'Member' does not include any Person that ceases to be a member in the Company. The initial Member will be Zohar." *Id.* at 4.

LLC Agreement unilaterally, then the amendment must be approved by the Members.[115] Based on the clear and unambiguous language of the provision, I agree.

Zohar then argues that under Section 5.8 of the LLC Agreement, the Members have the right to replace the Manger at will,[116] and that "Section 11.3 explicitly precludes the Manager from amending Section 5.8 because Section 5.8 does not include express permission to amend."[117] According to Zohar, the 2017 Written Consent amended Section 5.8 because it purportedly granted the Class A Interests the "sole right to . . . [r]emove and replace an existing Manager or appoint any additional manager."[118] While I agree with the logic, and the construction of the applicable provisions, Zohar ignores Amendment No. 1—which both parties have stipulated is valid[119]—where the parties agreed to delete the first and last sentence of Section 5.8 and approved a new Section 5.18.[120] Thus, after Amendment No. 1 was executed, Section 5.8 no longer contemplated the removal or appointment of the

---

[115] Zohar Post-Trial Opening Br. at 7.

[116] Zohar Post-Trial Answering Br. at 6–7, 26.

[117] *Id.* at 52–53.

[118] 2017 Written Consent at 2.

[119] PTO ¶ 38.

[120] Amendment No. 1 at 2 ("The following is hereby deleted in its entirety from the Agreement: The first and fifth sentences of Section 5.8.").

Manager by the Common Members. Instead, as discussed below, Section 5.18 now gives that right to the Series A Preferred Members.

Following Amendment No.1, Section 5.8 reads:

5.8 <u>Removal; Resignation</u>. The manager may resign at any time. Such resignation will be made in writing and will take effect at the time specified therein, or if no time be specified at the time of its receipt by any Common Member. The acceptance of a resignation is not necessary to make it effective, unless expressly so provided in the resignation.

And Section 5.18 provides:

Section 5.18. <u>Unanimous Voting</u>. In addition to any other consent required in this Agreement or provided by law or regulation but notwithstanding anything else in this Agreement to the contrary, no Member may take any of the following actions without the consent of each Series A Preferred Member:

(a) remove or replace an existing Manager or appoint any additional manager; provided that, any Manager may resign at any time, effective immediately upon notice to any Series A Preferred Member;

(b) give any directions to a Manager to take or refrain from taking any action or make any decisions on behalf of the Company (it being understood and agreed that the management of the Company shall be vested exclusively in its appointed Managers);

(c) amend this Agreement;

(d) dissolve or wind-up the affairs of the Company at any time by resolution or other action of any Member (it being understood that any dissolution or wind- up of the Company that would not otherwise require the consent of any Member shall not require such consent solely by virtue of this clause); or

(e) enter into any resolution or take any other action that, in the absence of this Section 5.18, could be entered into or taken without the consent of each Series A Preferred Member.[121]

At least as reflected in their briefing and closing arguments, neither Zohar nor Tilton appear to appreciate that Section 5.8 no longer provides any Member with the right to remove or appoint managers, or that those rights are now governed by Section 5.18.[122] Consequently, neither Zohar nor Tilton have argued that Section 5.18 should inform the Court's analysis.[123] Given the fact that both parties have proceeded as if the removal and appointment authority remains in Section 5.8, I will do the same.[124] That being said, whether the 2017 Transaction is analyzed

---

[121] *Id.* at 1–2.

[122] *See* Zohar's Pre-Trial Br. ("Zohar Pre-Trial Br.") (D.I. 130) at 48, 51, 61 (arguing that Section 5.8 governed removal and appointment of the Manager); Zohar Post-Trial Opening Br. at 2, 7 (same); Zohar Post-Trial Answering Br. at 6–7, 16, 26, 49, 51–52, 77 (same); Tilton Pre-Trial Br. at 27–28 ("While Section 5.8 gives Zohar the right to remove and appoint Stila's Manager, operating agreements *may be amended*. . . . Section 3.4 gave Tilton specific, express authority to enter into the 2017 Transaction and amend the contract's terms.") (emphasis in original); Tilton Post-Trial Opening Br. at 35 ("Prior to the amendment of the LLC Agreement, through the issuance of the Class A, the Common Members had the right to appoint Stila's Manager.") (citing to the Initial LLC Agreement § 5.8).

[123] Neither party cites Section 5.18 in their briefs. Zohar cites to Amendment No. 3 which purported to amend Section 5.18, but as discussed above, Amendment No. 3 is invalid. Zohar Post-Trial Opening Br. at 28.

[124] Indeed, the failure to rely upon Section 5.18 throughout these proceedings could be deemed a waiver of any argument that the section governs or is even relevant to the outcome here. *See, e.g.*, *In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 62 (Del. Ch. 2001) (deeming a party to have waived arguments that it did not present in its opening post-trial brief); *ABC Woodlands L.L.C. v. Schreppler*, 2012 WL 3711085, at *3 (Del. Ch. Aug. 15, 2012) (finding an argument "first raised in a pretrial brief" to be waived); *Oxbow Carbon*

through the lens of the original iteration of Section 5.8 or the amended Section 5.18 makes no difference. As explained below, under either provision, Tilton was required to obtain Member consent before she amended the LLC Agreement. Her failure to do so voids the 2017 Transaction, at least with regard to the removal and appointment of Stila's Manager.

As noted, in the second resolution of the 2017 Written Consent, Tilton purportedly granted Octaluna the "sole right to . . . [r]emove and replace an existing Manager or appoint any additional manager." But Section 5.8 of the Initial LLC Agreement grants the right to remove and replace the Manager to the then existing Common Member, i.e., Zohar. Thus, the 2017 Written Consent purports to amend Section 5.8 by stripping the Common Member's contractual right to remove and replace the Manger and granting that right to Octaluna. Under Section 11.3 of the LLC Agreement, this amendment to the LLC Agreement could not be effected without Zohar's consent.

Nothing in Section 5.8 can be construed as expressly authorizing the Manager to amend it unilaterally, even if the amendment was implicitly effected through the creation and issuance of a new class of Membership Interests in reliance on

*& Mins. Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 502 n.77 (Del. 2019) ("The practice in the Court of Chancery is to find that an issue not raised in post-trial briefing has been waived . . . .").

Sections 3.4 and 5.4 of the LLC Agreement.  By granting the new Class A Members the *sole* right to appoint the Manager, the 2017 Transaction did not just create additional rights for Class A Membership Interests, it also stripped away the right of the Common Member to appoint the Manager as expressly and exclusively granted to it in Section 5.8, thereby amending Section 5.8 without the requisite consent—Zohar's consent.

This construction does not do violence to the LLC Agreement, as Tilton argues,[125] because not every right granted to a new Membership Interest(s) would have required an amendment to the LLC Agreement for which the consent of the Members was required.  For instance, with regard to the distribution of the Company's proceeds, the Manager could have unilaterally created and issued new classes of Membership Interests with claims superior to those of the existing Members.  As Section 4.8 of the LLC Agreement makes clear:

> Subject to . . . *the terms of any class of Membership Interest created pursuant to the last sentence of Section 3.4*, at such time as the Manger may decide in her sole discretion, the Company will determine the

---

[125] Tilton Post-Trial Opening Br. at 71.  Tilton argues that this interpretation is improper under the canon of contract construction providing that specific contract provisions control over general provisions.  Specifically, she argues, "[w]hile Section 5.8 originally gave the Members that right, operating agreements may be amended.  Zohar cites no authority for its position that an amendment changing 'right x' in a contract violates that 'right x' in doing so.  Zohar's argument, if accepted, would mean that any amendment to a contract would give rise to a cause of action for breach.  This cannot be the law." *Id.*

amount of [distribution] and all or a portion thereof (as determined by the Manager) will be distributed in the following manner.[126]

Having included the language "subject to the terms of any class of Membership Interest created pursuant to the last sentence of Section 3.4," the LLC Agreement clearly provides that the Company's distribution policy automatically takes into account "any class of Membership Interest" created under the Manager's authority per Section 3.4. There is no such language in Section 5.8, however, thus illustrating the parties' intent that Section 5.8 cannot be amended by virtue of the creation and issuance of new classes of Membership Interests under Section 3.4. If Tilton were authorized to amend any and all sections of the LLC Agreement without Zohar's consent, as she claims,[127] Section 4.8's "subject to the terms of any class of Membership Interest created pursuant to the last sentence of Section 3.4" language would be mere surplusage. Delaware courts avoid such contract constructions.[128]

---

[126] Initial LLC Agreement § 4.8 (emphasis added).

[127] Tilton Post-Trial Opening Br. at 71.

[128] *See Franco v. Avalon Freight Servs. LLC*, 2020 WL 7230804, at *2 (Del. Ch. Dec. 8, 2020) (stating that Delaware courts "give each provision and term effect, so as not to render any part of the contract mere surplusage") (quoting *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010)).

Moreover, Section 5.8 is a provision that affects the Member's voting rights and the company's governance.[129] Given the sanctity of the franchise, Delaware law requires that provisions affecting voting rights and governance are to be construed strictly and any provision that purports to restrict the franchise must do so clearly.[130] There is nothing in 3.4 that even remotely suggests it authorizes the Manager, acting alone, to eliminate governance or consent rights enjoyed by the Members. Although there are provisions in the LLC Agreement that authorize the Manager to amend them unilaterally, Section 5.8 is not one of them.

---

[129] Additionally, amending Section 5.8 to remove Zohar's right to vote on the company's manager would amount to a waiver of that right. *See Manti Hldgs., LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1210 (Del. 2021) ("Under Delaware law, '[w]aiver is the intentional relinquishment of a known right.'") (quoting *Minna v. Energy Coal S.p.A.*, 984 A.2d 1210, 1214 (Del. 2009)); *George v. Frank A. Robino, Inc.*, 334 A.2d 223, 224 (Del. 1975) ("Intention forms the foundation of the doctrine of waiver and it must clearly appear from the evidence."). There is absolutely no evidence that Zohar intended to waive its right to consent to the removal or replacement of Stila's Manager.

[130] *See, e.g.*, *Manti*, 261 A.3d at 1210–11 ("A waiver may be either express or implied, but either way, it must be unequivocal.") (quoting *Dirienzo v. Steel P'rs Hldgs. L.P.*, 2009 WL 4652944, at *4 (Del. Ch. Dec. 8, 2009)); *Auriga Cap. Corp. v. Gatz Props.*, 40 A.3d 839, 852 (Del. Ch. 2012) ("Where the parties have clearly supplanted default principles in full, we give effect to the parties' contract choice."); *Kelly v. Blum*, 2010 WL 629850, at *10 n.70 (Del. Ch. Feb. 24, 2010) ("Having been granted great contractual freedom by the LLC Act, drafters of and parties to an LLC agreement should be expected to provide parties and anyone interpreting the agreement with clear and unambiguous provisions when they desire to expand, restrict, or eliminate the [foundations of the entity's governance].""); *Harrah's Ent., Inc. v. JCC Hldg. Co.*, 802 A.2d 294, 297 (Del. Ch. 2002) (recognizing a "rule of contract construction in favor of the free exercise of franchise rights"); *Levitt Corp. v. Office Depot, Inc.*, 2008 WL 1724244, at *3 (Del. Ch. Apr. 14, 2008) ("[G]iven the special prominence of the shareholder franchise under Delaware law, restrictions that are not clear and unambiguous should not be interpreted to limit shareholder democracy.").

The result is no different if Section 5.18 governed removal and replacement of the Manager. Like the original version of Section 5.8, Section 5.18 explicitly provides a class of interest holders, not Tilton as Manager, with the right to remove and replace Stila's Manager. Section 5.18 provides that Stila's Manager cannot be removed or replaced without the consent of each Series A Preferred Member.[131] Even if Section 5.18 was somehow not amended by the 2017 Written Consent, that provision would have required Tilton to obtain the consent of the Series A Preferred Member before appointing herself as Manager.[132] She admits she did not do so.[133]

Tilton next argues that even if "Tilton violated the LLC Agreement and exceeded her authority under it . . . the result would be a *voidable* transaction

---

[131] Amendment No. 1 at 1. I note that in February 2016, Stila redeemed Zohar's Series A Preferred Interests in full, and the Series A Preferred Interests were retired. PTO ¶ 62; JX 34 (copy of Stila Styles, LLC Written Consent of Manager, dated as of January 27, 2016, approving the redemption of the Series A Preferred Interests). This does not, however, mean that Tilton was excused from the obligation to seek consent before amending the LLC Agreement with respect to the removal and appointment of the Manager. Only the Common Member (Zohar) was empowered to authorize that amendment. Amendment No. 1 at 1. In other words, even if the Series A Preferred Member(s) no longer existed following the 2016 redemption of their interests, this did not give Tilton license to amend the LLC Agreement to give the right to remove and appoint the Manager to a new class of equity she created and controlled. Both before and after the redemption, the right to amend the LLC Agreement in that regard remained with Zohar.

[132] Amendment No. 1 at 1.

[133] Tilton Dep. 202:8–25 (testifying that the right to appoint Stila's Manager rests with the Class A equity and acting as the Class A member she appointed herself as Manager); Tr. 405:23–406:3 (Tilton) (testifying she did not seek any Member's approval when she appointed herself as Manager because she "had sole authority to make that appointment").

[and not a void transaction]."[134]   Here again, I disagree.[135]   As this court recently

stated:

> Void acts are those the entity itself has no implicit or explicit authority to undertake or those acts that are fundamentally contrary to public policy. Stated differently, they are acts that the entity lacks the power or capacity to effectuate. Voidable acts are within the power or capacity of an entity, but were not properly authorized or effectuated by the representatives of the entity.[136]

Having found that Tilton did not have the authority to amend either Section 5.8 or

Section 5.18 unilaterally, the 2017 Transaction, to the extent it purported to grant

Octaluna the sole right to remove and replace the Manager, is void. So too is the

2020 Written Consent purportedly executed on authority of the 2017 Transaction.[137]

---

[134] Tilton Pre-Trial Br. at 59 (emphasis added).

[135] *See Waggoner v. Laster*, 581 A.2d 1127, 1137 (Del. 1990) (upholding the Court of Chancery's determination that voting rights were void because the board lacked authority under the company's certificate of incorporation to authorize preferred stock with such special rights).

[136] *In re CoinMint, LLC*, 261 A.3d 867, 890 (Del. Ch. May 10, 2021) (quoting *CompoSecure, L.L.C. v. CardUX, LLC*, 2018 WL 660178, at *26 (Del. Ch. Feb. 1, 2018)).

[137] I acknowledge that the parties have engaged extensively regarding the extent to which Tilton breached her duty of good faith and fair dealing in effectuating the 2017 Transaction, even if she possessed the contractual authority to do so. Having found that Tilton did not have this authority, I need not and will not decide whether she did or did not breach the duty of good faith and fair dealing. This issue is irrelevant to the Court's analysis as laid out in this opinion and, as previously observed, any decision regarding the issue could create issue preclusion or claim preclusion concerns with respect to the parties' ongoing litigation in other courts, including the Bankruptcy Court. There is simply no need to confound those courts' decision-making with unnecessary declarations here.

Zohar's sole request in its prayer for relief is a declaration that the individual it purported to appoint in the 2021 Written Consent, Kevin Carey, is the Manager of Stila.[138] This request, in essence, amounts to a declaration that Zohar, not Tilton, has the right to appoint Stila's Manager. And, having found Tilton did not and does not have that right, I end my analysis here. In this regard, I note that the parties did not brief what should happen if part, but not all, of the 2017 Written Consent is declared invalid. Having received no guidance from the parties, I see no reason to surmise whether the other features of the 2017 Transaction, beyond the designation of the Class A Member's sole right to remove and appoint Stila's Manager, are or are not valid, especially since those questions are pending before the Bankruptcy Court.[139]

## III. CONCLUSION

Tilton did not have the authority to amend the LLC Agreement to strip Zohar of its right to remove and replace the Manager and give that right to herself. To the

---

[138] Compl. at 21 ("WHEREFORE, Zohar respectfully requests that the Court enter judgment declaring that under 6 *Del. C.* Section 18-110 Kevin Carey is the Manager of Stila and granting such other relief as this Court deems just and appropriate.").

[139] Am. Adversary Compl. ¶¶ 420–24, 458–63 (Count XVIII brought against Tilton and her affiliates claiming that she had no right to any tax distributions from any portfolio companies at any time); Am. Adversary Compl. ¶¶ 478–88, 513–22 (Count XXV brought against Tilton alleging that she breached the LLC agreements of the portfolio companies (including Stila) and the covenant of good faith and fair dealing implied in such LLC agreements when she issued the Class A Interests to benefit herself).

40

extent Tilton purported to do so via the 2017 Transaction, that aspect of the transaction is void. So too is the 2020 Written Consent purportedly executed on authority granted by virtue of the 2017 Transaction. A judgment to this effect will be entered today. The right to remove and appoint Stila's Manager, therefore, remains with the person or entity that held such right prior to the 2017 Transaction.[140]

---

[140] Here again, the parties have not joined issue on the effect(s) of Amendment No. 1 on the validity of the 2021 Written Consent. Accordingly, I will not venture down that road without a map.